**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**DONALD CHOYA BATES,**

      **Plaintiff,**

                                             **Civil Action No. 5:16cv161**

**v.**                                                    **(Judge Stamp)**

**JENNIFER SAAD, Warden, FCI Hazelton;
R. MULAC, Correctional Officer, FCI Hazelton;
R. SMITH, Correctional Officer, FCI Hazelton;
C. FLOYD, Correctional Officer, FCI Hazelton;
J. SQUIRES, Correctional Officer, FCI Hazelton;
M. DOYLE, Correctional Officer, FCI Hazelton;
and UNKNOWN PARTIES,**

      **Defendants.**

## REPORT AND RECOMMENDATION

The *pro se* Plaintiff, Donald Choya Bates ("Bates") an inmate incarcerated at USP McCreary in Pine Knot, Kentucky, initiated this Bivens[1] action by filing a civil rights complaint on October 25, 2016, along with a motion to proceed *in forma pauperis* ("IFP") and supporting documents. ECF Nos. 1, 2, 3, & 4. By Order entered October 31, 2016, Bates was granted leave to proceed IFP and directed to pay an initial partial filing fee.  ECF No. 6. On November 17, 2016, Bates paid the requisite fee.  ECF No. 9.

Thereafter, on December 13, 2016, Magistrate Judge James E. Seibert conducted a preliminary review of the complaint and entered an Order directing the Clerk to issue a sixty (60)-day summons to each defendant and to have the United States Marshal Service effect service on each. ECF No. 11.  Also in that Order, Bates was given an additional thirty days in which to identify the John and/or Jane Doe defendants or risk their dismissal from the case. Id. On December 27, 2016, Bates moved for appointment of counsel.  ECF No. 16.  By Order

---

[1] Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

entered January 5, 2017, Plaintiff's motion for appointed counsel was denied. ECF No. 18. On February 14, 2017, the Defendants moved for an extension of time and consolidated response date.  ECF No. 28.  By Order entered the next day, the Defendants' motion was granted.  ECF No. 29. On April 5, 2017, the Defendants filed a second motion for an extension of time. ECF No. 32.  By Order entered April 24, 2017, the Defendants were granted a second extension. ECF No. 34. On May 5, 2017, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment with a memorandum in support. ECF Nos.  36 & 37. Because the Plaintiff was proceeding *pro se*, the undersigned issued a Roseboro[2] notice, advising the Plaintiff of his right to file a response to the Defendants' dispositive motion. ECF No. 39. On June 2, 2017, Plaintiff moved for an extension of time. ECF No. 42.  By Order entered June 12, 2017, Plaintiff was granted the extension. ECF No. 44. On June 19, 2017, Plaintiff filed a letter motion for a second extension of time.  ECF No. 45. On June 26, 2017, Plaintiff filed a motion for discovery. ECF No. 47.  By separate Orders entered July 3, 2017, the Defendants were directed to respond to Plaintiff's motion for discovery and Plaintiff was granted the second extension of time.  ECF Nos. 48 & 49.   On July 7, 2017, the Defendants filed a response in opposition to Plaintiff's motion for discovery. ECF No. 50. On July 31, 2017, Plaintiff filed his response, titled Plaintiff's Reply to Defendant[']s[] Motion to Dismiss or, in the Alternative, for Summary Judgment.  ECF No. 53.  By Order entered September 15, 2017, this case was reassigned from Magistrate Judge James E. Seibert to Magistrate Judge Michael J. Aloi.

Accordingly, this case is now before the undersigned for review, report and recommendation pursuant to LR PL P 2.

## I. Contentions of the Parties

---

[2] Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975).

A. **The Complaint**

In the complaint, the Plaintiff raises claims of excessive force and destruction of personal property arising out of a December 10, 2015 assault by FCI Hazelton staff member who accused him of not saying "good morning." ECF No. 1 at 9. Plaintiff contends he was grabbed by the top front of his shirt or neck, thrown to the floor of his cell, kicked and punched, jumped on, and taken to an outside stairwell where he was dragged backwards down the stairs and the beating and kicking of his face and head continued, even though he was handcuffed and not resisting. Id. at 6 and 9. Plaintiff alleges that after the assault, he was placed into a holding cell for "numerous hours," not fed anything and not provided with medical care. Id. at 12. He contends that all of his legal and personal property was destroyed by "officer R. Mulac or whoever packed my property" and he never received it. Id. He asserts that he was "sent to a USP from a lower security" institution, because they "jacked up my points beyond the norm," transferring him far away from his family. Id. Finally, he alleges that staff participated in creating a false incident report against him to punish him further by blaming him for the altercation, resulting in the loss of 40 days good time and other sanctions. Id. at 10.

Plaintiff alleges that as a result of the assault, he sustained a dislocated or broken middle finger, injury to his lower back, swollen right eye, bruises and/or scarring to both elbows, knees, wrists and face. Id. at 18.

The Plaintiff maintains that he has exhausted his administrative remedies with regard to his claims. Id. at 4 - 14.

As relief, he requests $50,000,000.00 in compensation for his personal injuries; $2,000,000 in compensation for the destruction of all of his personal property; and injunctive relief in the form of the dismissal of the incident report and sanctions against him, restoral of 40

days of lost good time, that he be "restored back to FCI," and that all of the officers involved be

held accountable for their actions, including "firing" for excessive force. Id. at 18.

## B. **The Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment**

The Defendants contend that the Plaintiff's complaint should be dismissed or summary

judgment granted in their favor because

1) Defendants Saad, Doyle, Floyd, and Squires had no personal involvement in Plaintiff's alleged incident of excessive force, and thus they should be dismissed from this action;

2) the use of force by Officers Mulac and Smith  was a good faith effort to restore discipline to an unrestrained aggressive inmate, and was not excessive;

3) Plaintiff's version of events is discredited by the video and documentary evidence submitted to the Court for in camera review;

3) as government officials performing discretionary functions, Defendants are entitled to qualified immunity;

4) Plaintiff's claims regarding his disciplinary actions over his incident report are not cognizable in a Bivens action but must be brought under 28 U.S.C. § 2241;

5) Plaintiff's claim that he was left without medical attention for hours is contradicted by documentary evidence; and

6) Plaintiff's claim that his property was destroyed is contradicted by documentary evidence.  See ECF No. 37 at 5 – 14.

## C. **Plaintiff's Response in Opposition**

In his responses, the Plaintiff reiterates his claims and attempts to refute the defendants'

arguments on the same, alleging that the Defendants have withheld parts of the video

surveillance recording that would reveal the guards assaulting him.  ECF No. 53 at 2.  Further, he

contends that the sworn declarations of the prison guards regarding the incident are conflicting,

and inconsistent with the guards' statements.  Id. at 3.  Finally, he argues that the copies of his

medical records produced by the Defendants are inconsistent with the statements of the guards.

Id. He asserts that the guards "are now attempting to cover up their misconduct by withholding evidence of the assault that took place in the stairwell after Bates was removed from the housing unit." Id. at 4.

## I. <u>Standard of Review</u>

### A. <u>Motion to Dismiss</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at

5

570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court, which has held that a "claim has factual plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

**B. Motion for Summary Judgment**

A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Motions for summary judgment impose a difficult standard on the moving party because it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Fed. Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). In applying the standard for summary judgment, a court must review all evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u>, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Electric Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id.</u> This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . .must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." <u>Id.</u> "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. <u>Anderson</u>, 477 U.S. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

This Court is required to liberally construe *pro se* complaints. <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007); <u>see also</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972); <u>Gordon v. Leeke</u>, 574 F.2d 1147, 1151 (4th Cir. 1978). Such *pro se* complaints are held to a less stringent standard than those drafted by attorneys. <u>Erickson</u>, *supra* at 94; <u>Gordon v. Leeke</u>, *supra* at 1151, and a federal district court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a

potentially meritorious case. Hughes v. Rowe, 449 U.S. 5, 9 (1980); Cruz v. Beto, 405 U.S. 319 (1972). When a federal court is evaluating a *pro se* complaint, the plaintiff's allegations are assumed to be true. Erickson, 551 U.S. at 93 (*citing* Twombly, 550 U.S. at 555-56). Nonetheless, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court. See Weller v. Dep't. of Social Srvcs., 901 F.2d 387 (4th Cir. 1990); see also Ashcroft v. Iqbal, 556 U.S. 662 (2009)(outlining pleading requirements under Rule 8 of the Federal Rules of Civil Procedure for "all civil actions"). The mandated liberal construction afforded to *pro se* pleadings means that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so; however, a district court may not rewrite a complaint to include claims that were never presented, Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999), construct the plaintiff's legal arguments for him, Small v. Endicott, 998 F.2d 411 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court, Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). Finally, although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. Randall v. United States, 95 F.3d 339 (4th Cir. 1996). See also Dunbar Corp. v. Lindsey, 905 F.2d 754, 764 (4th Cir. 1990).

### III. Analysis

#### A. Excessive Force

#### 1) Warden Saad

Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Truloch v. Freeh, 2755 F.2d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, in order to establish liability in a Bivens case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2nd

Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainbright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for violation of a constitutional right in a Bivens case. Rizzo v. Good, 423 U.S. 362 (1976).

Here, Plaintiff does not allege any personal involvement on the part of Defendant Saad. He merely names her as a defendant and alleges that after the December 10, 2015 incident, she "never came to see what happened," impliedly contending that she condoned the allegedly excessively forceful officers' actions.[3] ECF No. 1 at 12. Elsewhere, he lists her in Claim Five, for "excessive force, physical abuse, loss of property." Id. at 18. However, he makes no specific allegation against her there either, beyond listing her name with other defendants' names. Accordingly, Plaintiff appears to name Saad only in her official capacity as the warden of FCI Hazelton.  However, a suit against government agents acting in their official capacities is considered a suit against the United States itself. See Kentucky v. Graham, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally present only another way of pleading an action against an entity of which an officer is an agent.'"). Thus, remedy under Bivens is not available against this defendant in her official capacity, and she  should be dismissed with prejudice as a defendant in this action.

---

[3] The December 10, 2015 "excessive force" incident began at around 7:43 a.m. and concluded at approximately 7:52 a.m. Given that Plaintiff was seen in health services immediately afterwards, before being transferred later that same day to FCI Cumberland [see Declaration of Dominick Desanto, Paralegal Specialist in the Mid-Atlantic Region of the BOP ("Desanto Decl.") ECF No. 37-1 at 2 - 3; see also Inmate History, ECF No. 37-1 at 9, indicating that Plaintiff arrived at FCI Cumberland sometime between 8:00 a.m. and 4:46 p.m. on December 10, 2015], a distance of approximately 60 miles, it begs the question how Warden Saad could have had time to have had any involvement at all.

**2)  R. Mulac, R. Smith, M. Doyle, C. Floyd, and J. Squires[4]**

Analysis of a claim for use of excessive force begins with "identification of the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). In the context of a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments. The validity of the prisoner's claim must "be judged by reference to th[is] specific constitutional standard . . . rather than to some generalized 'excessive force' standard." Graham v. Connor, supra at 394; see e.g., Whitley v. Albers, 475 U.S. 312, 318-326 (1986)(claim of excessive force to subdue convicted prisoner is to be analyzed under an Eighth Amendment standard).

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. See e.g., Hudson v. McMillian, 503 U.S. 1, 7-8 (1992). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness'" in light of the particular circumstances surrounding the challenged conduct. Wilson v. Seiter, 501 U.S.294, 299 (1991). When prison officials are accused of using excessive force, the "wantonness" issue turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson, 503 U.S. at 7 (internal quotation marks omitted).

The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of "contemporary standards of decency." Hudson, 503 U.S. at 8. In assessing this

---

[4] Plaintiff's complaint alleges that one "J. Knotts" also participated in the excessive force incident [ECF No. 1 at 17], but because he failed to name Knotts as a defendant, no analysis of any claim against Knotts will be undertaken.

component, the court must ask whether "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. (quoting Wilson, *supra* at 298). When prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated . . . This is true whether or not [sic] significant injury is evident." Hudson, 503 U.S. at 9. However, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to "*de minimus* use of physical force provided that the use of force is not the sort repugnant to the conscience of mankind." Id. at 10 (internal quotation marks omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Id. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2nd Cir. 1973).

As previously noted, Plaintiff has alleged that on December 10, 2015, at FCI Hazelton, that R. Mulac, R. Smith, M. Doyle, C. Floyd, and J. Squires all subjected him to excessive force. See ECF No. 1 at 16 – 18. However, a review of the materials supplied by the Defendants clearly establish that the force used was applied in good faith in an effort to restore discipline and order.

Plaintiff contends that on the morning of December 10, 2015, while lying on his bed in his cell at FCI Hazelton, the "unit officer" for that day[5] came in his cell and harassed him for not speaking, then grabbed him by the top of his shirt. ECF No. 1 at 5. When Plaintiff backed away, and asked "what are you doing," the officer rushed and jumped him, and they both fell to the floor. He contends that despite the fact that he had his "hands up" and was backing away, other officers soon joined in; Plaintiff contends he was dragged out of the unit by his neck, jumped on, before being pulled out of the unit "led by the compound Lt.," and taken to an outside stairwell where the beating and kicking of his face and head continued, even though he was handcuffed

---

[5] The "unit officer" for that day was apparently Defendant Ryan Mulac. See ECF No. 37-2 at 2.

and not resisting, before he was dragged backwards down three flights of stairs where he was left for hours, not fed or given medical care. Id. at 5 - 6, 9, & 11. Plaintiff contends that Defendant Doyle assisted in taking him to the outside stairwell where he was beaten, punched and kicked while handcuffed.  Id. at 17.  He contends that the video surveillance will show that he was handcuffed, badly injured and "never resisted." Id. at 11. He specifically contends, without providing detail, that Defendant Floyd "participated in the beating [id.]," and that Defendants R. Smith and J. Squires also participated in the excessive force and physical abuse. Id. at 18.

Defendants deny that any excessive force was used; in support, they produce a DVD containing Vicon surveillance video footage of eight different views of the December 10, 2015 incident, or portions of the incident, as captured from surveillance cameras at different locations, for an in camera review. There is no sound.  The different footages are labeled variously as 128 L4 DR6 ("DR6"); 127 L4 DR5 ("DR5"); 126 L4 DR4 ("DR4"); 125 LR DR3 ("DR3"); 124 L4 DR2 ("DR2"); 123 L4 DR1 ("DR1"); 122 L4 Inner ("L4 Inner"); and 121 L4 Outer ("L4 Outer").  See ECF No. 37-1.

View DR6 begins at 7:43.59 a.m., and ends at 7:51.51 a.m., with a view of what appears to be the FCI Hazelton dayroom or common area, with two tiers of cells, an upper and a lower, opening onto it. At 7:45.06 a.m., in the distance, in the upper left of the screen, a correctional officer ("CO") now known to be Mulac, appears to be standing in the open doorway to a cell on the lower tier, apparently talking to the occupant of that cell.  Other inmates are milling around the dayroom; one is ironing on a table in the center of the room.  At 7:45.10 a.m., it appears as though the CO previously seen in the cell doorway (Mulac) is now patting down an inmate (who later proves to be Bates), who is now outside the  cell facing the wall during the pat-down.  Bates is wearing a white hat, a brown shirt, and gray sweats. Mulac is wearing a blue shirt with a strap

over his right shoulder. At 7:45.27, Bates turns around to face Mulac and they appear to argue. At 7:45.27, Bates briefly appears to turn to face the wall again, but then turns back to face Mulac again; Mulac appears to be attempting to redirect him.   At 7:45.39, Bates appears to be pushing/slapping Mulac's hands away from him.   At 7:45.40, Bates shoves Mulac hard.   At 7:45.45, Mulac approaches Bates, who is backing away from the wall out into the dayroom, while pushing and shoving at Mulac; the two begin to grapple.   At 7:45.46, Bates and Mulac are hanging on to each other, struggling, with Mulac attempting to gain control. At 7:45.51, Bates and Mulac fall to the floor next to each other.   At 7:45.52, both are back on their feet, grappling arms; Mulac is approaching, trying to grab Bates' arms; Bates continues to swat Mulac's hands away and back up. At 7:46.04, Mulac is continuing to approach while Bates dances backwards, resisting; by now, it is apparent that the incident has captured the attention of the inmates in the dayroom.   At 7:46.08, Mulac is walking steadily toward Bates, who backs up, but then finally appears to relent and follow direction.   At 7:46.16, the two now appear on the opposite side of the dayroom, walking along the wall with Bates in front and Mulac behind; Mulac is holding Bates' right shoulder/upper arm.   At 7:46.18, the two go through a set of double doors at the right side of the dayroom and are no longer visible.   Several other COs follow them through the doors.   At 7:46.30, other COs come running and follow them through the double doors. At 7:46.43, other inmates from the dayroom gather, looking through the double doors. At 7:47.24, several COs enter the dayroom through the double doors and appear to give the inmates a direction to disperse, because the inmates move away from the doors.

In View DR5, which begins at 7:49.59 a.m. and ends at 7.51.51 a.m., the dayroom is now visible from a different angle.   Multiple inmates are sitting or milling around in the dayroom; whatever activity related to Bates' altercation with Mulac apparently occurs to the right of the

camera, because at around 7:45.54, all inmates in the dayroom begin looking in that direction. At 7:46.37, most of the inmates in the dayroom begin walking in that direction, but no portion of any altercation is visible. At 7:46.53, the inmates head back to the dayroom and resume their activities.  At 7:47.29, the inmates are walking around the dayroom, gathering their belongings, apparently in preparation for returning to their cells. At 7:47.48, COs are now visible, apparently directing the inmates to return to their cells. By 7:48.33, the camera shows a dayroom now empty of inmates, with several COs standing around.

In View DR4, which begins at 7:44 a.m. and ends at 7:51.51 a.m., the dayroom is now visible from another angle. At 7:45.46, Bates and Mulac briefly come into view in the distance from the left, already fighting, then are lost from sight.   At 7:46.07, they reappear; Mulac is already walking Bates off the unit through the double doors where they are again out of view; other COs follow.  Other inmates approach and gather, watching through the doors after them. At 7:47 a.m., other COs come back through; the door to the left is open and individuals can be seen through the doorway milling around, but no violence is evident.

In View DR3, which begins at 7:43.59 a.m. and ends at 7:51.51 a.m., in yet another view of the dayroom, Mulac is again visible in the distance, standing in Bates' open cell doorway.  At 7:45.01, Bates comes out, turns around to face the wall, and the pat-down begins.  Bates initially appears cooperative. At 7:45.27, Bates begins to get pushy with Mulac.  At 7:45.39, the struggle between Bates and Mulac escalates with pushing and shoving. Mulac appears to be pointing and directing Bates; they are now in the dayroom. At 7:45.41, Mulac grabs Bates, who backs away. At 7:45.45, both are shoving and pushing.  At 7:45.47, the two briefly disappear from view on the right of the screen.  They reappear at 7:45.49 a.m.; at 7:45.51 a.m., both fall to the floor.  By 7:45.53, both are back on their feet, with Mulac trying to get Bates under control; Bates is

14

pushing back, backing away, and resisting.  By 7:46.01, the two are struggling; Bates is clearly not following orders and continuing to back away further into the dayroom. At 7:46.05, Bates is still backing away and not cooperating while Mulac repeatedly reaches for him.  At 7:46.11, they disappear from view again in the far right of the screen.   At 7:46.38, other inmates begin congregating to watch.   At 7:48.47, the dayroom gradually begins clearing and other COs are checking cell doors on the bottom tier.  By 7:50.08, a couple COs amble past; no altercation is visible and the other inmates appear to have returned to their cells; a CO on the upper tier is checking cell doors.

On View DR2, which begins at 7:44 a.m. and ends at 7:51.51 a.m., in another view of the dayroom, for the first time in a close-up view, Bates and Mulac initially appear at the bottom of the screen at 7:45.51; they are already in the dayroom and the struggle is underway. Bates is clearly resisting direction from Mulac and Mulac appears to be attempting to subdue him.  At 7:45.56, Mulac is grabbing at Bates, who resists and pushes Mulac's hands away.  At 7:46.01, both disappear at the bottom right corner of the screen.  At 7:46.37, they are still not visible on the screen, but other inmates are beginning to gather. By 7:49.10, the inmates have left (presumably to return to their cells) and several COs are milling about the dayroom. Bates and Mulac are still not visible. At 7:49.21, the COs are checking cell doors on the bottom tier. By 7:50 a.m., there are three COs in the dayroom, walking along and talking.

In View DR1, which begins at 7:44 a.m. and ends at 7:51.51 a.m., another view of the dayroom is again visible. At a desk in the center of the room, one inmate is ironing; another is seated on a card table; others in the background appear to be playing cards or casually milling around. At 7:45.47, Bates and the CO first appear in the bottom right half of the screen, already out in the dayroom struggling. At 7:45.51, they fall, although most of the struggle is not visible

15

on the screen.  At 7:45.53, at the bottom right corner of the screen, they reappear, flailing.  At 7:46.16, they reappear, now at the left of the screen, and walking in an orderly fashion between the wall and the stairs to the upper tier; Bates appears to finally be cooperating.  At 7:46.19, they pass under upper tier's walkway and through the double doors to the left and are no longer visible.  At 7:51.51, other COs arrive, running through the same double doors after them.  Other inmates begin congregating near the doorway to watch. At 7:46.51, inmates have gathered in the dayroom near the doorway and are looking through the doors.  By 7:47.08, the inmates begin drifting away.

In View L4 Inner, which begins at 7:43.59 a.m. and ends at 7:51.51 a.m., what appears to be a small room with two barred windows and a door with a barred window in it is visible; looking through the barred windows, there appears to be an outside porch on the other side. The door with the barred window opens outward, toward the porch.  At 7:46.04, a tall CO[6] comes running up the stairs from the outside. At 7:46.11, this CO (now known to be R. Smith) comes running through the door with the barred window.  At 7:46.17, the door swings shut and no one else is visible.  At 7:46.21, Bates appears, being escorted by Mulac; Bates is not cuffed; Mulac is holding Bates' right upper arm/shoulder and they head for the door with the barred window. At 7:46.23, they go through the door; Bates appears uninjured and is walking cooperatively and without any visible impairment. At 7:46.26, Bates and Mulac are followed through the door with the barred window by Smith; Smith is now behind Bates and Mulac, who is still holding Bates' shoulder. Bates is walking without assistance or resistance. They are now visible through the barred windows on what appears to be an outside porch.  At 7:46.27, Bates appears to begin to struggle again.  At 7:46.29, Smith grabs Bates and pulls him down.  At 7:46.31, Mulac moves in

---

[6] This CO is apparently Defendant R. Smith.  See ECF No. 37-3 at 2 – 3.

to assist; both COs struggle to regain control of Bates on the porch.  Another CO arrives at the bottom right of the screen, headed for the door to the outside porch.  At 7:46.33, multiple other COs arrive from outside and inside.  It appears from the limited view through the barred windows that Bates is now on the floor with at least two COs.  By 7:46.34, a fierce struggle appears to be underway; other COs run through the door to the porch to help.  At 7:46.39, multiple COs have Bates down; two more are visible in the background, coming in from outside. There is no hitting, punching, or kicking visible; it appears to be merely a struggle to subdue Bates.  The door remains partially open, held in place by the last-arriving CO's feet; that CO is on his knees, helping.  At 7:46.45, a female CO comes through the door, going the other way; a clump of COs are still partially visible on the floor where Bates went down.  At 7:46.54, more COs arrive in the background; the female CO returns and holds the door open. By 7:47.25, there are so many COs in the limited quarters (and limited view) it is difficult to see, but it appears that Bates is still being subdued on the floor beneath the barred window to the left of the door.  By 7:47.36, some COs appear to disperse; others are standing around as if there is no longer any urgency to the situation.  By 7:47.41, many COs come back through the door, as if they are no longer needed on the porch; Bates still appears to be subdued on the porch floor. At 7:48.08, many COs have left; a tall man wearing a white shirt with a sweater and a tie is observing, standing, holding the door open.  At 7:48.22, several COs re-congregate at the door, looking through the windows, observing; it appears that Bates is still being subdued on the floor of the porch.  At 7:49.12, it appears as though Bates is now back on his feet and being escorted; however, the small area is so crowded with BOP personnel it is difficult to say with certainty. By 7:49.47, all the COs and Bates appear to have gone through the doorway in the background; as the door swings shut, they are visible going down outside steps in the distant background. By

7:49.58, a few COs are still milling around on the outside porch.  At 7:50.05, two COs accompanied by what appears to be BOP officials, come back through the barred door. Several times, passing personnel appear to look at the floor of the porch where Bates was restrained, but whatever they were looking at is not visible to the viewer.

In View L4 Outer, which begins at 7:43.59 a.m. and ends at 7:51.51 a.m., the view is now from the opposite side of the barred door and windows, on the porch.  It appears to be a small cement porch with its sides completely enclosed by heavy metal mesh.  At 7:46.10, a tall CO (Smith) comes running up, unlocks the door and goes inside.  At 7:46.20, Bates appears, being led by Mulac.  At 7:46.25, the door opens, Bates comes through with Mulac right behind him; they are not even touching; Smith is in the background, following them through this door.  At 7:46.26, Bates and Mulac are now on the porch; Smith is behind them.  Mulac now takes Bates' right upper arm again, as if to turn him.  At 7:46.28, at the lower right of the screen, Mulac appears to press Bates against the mesh screen sidewall of the porch.  Smith rushes forward to assist.  By 7:46.29 a.m., an obvious altercation is underway; however, it is mostly at the bottom right corner of the screen where it is not visible to the viewer.  By 7:46.31, it is now a big struggle; Bates and the two COs fall to the floor; Smith is on the bottom; Bates is in the middle, and Mulac is on top. Another CO arrives in the background.  By 7:46.33, other COs arrive to assist in what appears to be a violent struggle by Bates.  At 7:46.56, multiple COs are in a pile on top of Bates, lying on him or pressing him down on the floor with their arms, legs and bodies, as if in an attempt to subdue him.  No punching or kicking is seen.

By 7:47.04 a.m., it appears that the intensity of the struggle is diminishing; it is difficult to see whether Bates has finally been cuffed.  At 7:47.15, Mulac emerges, rising from the group of COs holding Bates down on the porch deck, and walks away from the struggle, where he

18

disappears from view at the right corner of the screen.  By 7:47.41, there are what appears to be six remaining COs in a knot on the floor with Bates beneath them; it appears that they are applying restraints but the view is occluded by their bodies. At 7:47.54, other COs are coming and going; the altercation appears to be over, because these COs merely glance down at the pile that is Bates and the COs as they pass. At 7:48.23, other BOP personnel arrive; one of them, wearing a white short-sleeved shirt, leans over to look, but Bates is not visible to the viewer beneath the COs in the foreground.  At 7:48.36, Bates is still down and still not visible, but there are COs milling around talking.  At 7:49.02, the COs restraining Bates appear to back off and turn Bates over; only Bates' legs are visible to the viewer. At 7:49.07, the COs assist Bates to his feet; he is cuffed in back but it is not apparent whether his legs are also shackled.  Two COs are holding Bates' arms from behind; one is pushing Bates' head down; Bates' face is not visible. At 7:49.11, the COs turn Bates around to make him walk backwards; he is bent forward with his head down and his cuffed arms raised up behind him. At 7:49.14, they head toward where the stairs to the outside appear to be, and disappear from view at the bottom of the screen.  A view of the area of the porch deck where Bates was restrained shows nothing but what appears to be some small scraps of paper or litter; there is no blood or bodily fluid present.

Defendants argue that Defendant Mulac was working Plaintiff's unit on the day of the incident, and was conducting security rounds when he noticed that Plaintiff had an outside window to his cell covered. ECF No. 37 at 2.  Mulac entered Plaintiff's cell and directed him to submit to a pat search. Id. Plaintiff refused multiple commands to do so, became aggressive, and pushed and slapped at Mulac's hands.  Id. at 2 – 3.  Concerned for his own safety, Mulac activated his body alarm. Id. at 3.  Other officers began to respond; Plaintiff was repeatedly directed to turn around and cuff up but refused to do so.  Id. at 4. Defendant Smith arrived on the

scene just as Mulac was escorting Plaintiff off the unit compound's side door and witnessed Plaintiff's multiple refusals of Mulac's direct commands to face the wall and cuff up. Id.  Smith witnessed Plaintiff raise his hands toward Mulac and intervened, bringing the Plaintiff to the floor, landing beneath the Plaintiff.  Id. Other non-party officers also responded and attempted to subdue Plaintiff; once Plaintiff was restrained, he was escorted to Health Services. Id.

Defendant Ryan Mulac submitted a memorandum to Lt. Doyle regarding the December 10, 2015 incident on the day it happened, stating:

> On December 10, 2015 at approximately 7:45am, I Officer R. Mulac was conducting security rounds in L-D housing unit. When I came to cell 311 I noticed that the outside window of the cell was covered. I knocked on the door and opened it to see inmate Bates lying on the bottom bunk with headphones on his ears. I stated good morning, how are you today. The inmate did not reply. I said Good morning louder. He finally replied, I'm looking right at you nodding my head. I said I couldn't see because the room was dark. I replied that when someone says good morning that you're supposed to say good morning back. He then said that I'm not a young punk and not to give him attitude. At this time inmate Bates became verbally combative. I told him to get out of bed so that I could conduct a pat search and cell search. He said call whoever you need to call, Captain, Lieutenant, whoever I needed. Inmate Bates was refusing to get out of bed at this time. I gave him a direct order to get out of bed. Once he got out of bed, I told him to turn around so I could conduct a pat search. After turning away from me, I placed my hands on his shoulder to begin my pat search. Inmate turned towards me; I stopped the pat search and redirected the inmate to turn away from me. He turned towards me again. I attempted to place the inmate on the ground. The inmate refused to comply. At this time, I pressed my body alarm for staff assistance. Once staff responded, we placed the inmate on the ground with the least amount of force necessary to gain control. Once controlled, hand and leg restraints were placed on the inmate. Nothing else follows.

ECF No. 37-2 at 4. Defendant Ryan Mulac also provided an April 27, 2017 sworn declaration regarding Plaintiff's allegations of excessive force, stating in pertinent part that

> On December 10, 2015, I was assigned as the L-4 housing unit officer. I was conducting security rounds, when I noticed an outside window of a cell was covered. I entered the cell and informed inmate Bates ("Plaintiff") that I was going to perform a pat search on him. The plaintiff refused multiple commands to submit to a pat search. He became aggressive and pushed and slapped my hands away. He then became assaulted [sic] toward me, knocking me to the ground. I

did not know if he had a weapon on him, and was concerned for my safety. I then activated my body alarm. At this point, the inmate started to comply, and I escorted him away from other inmates and out of the housing area. At that point, I gave inmate Bates multiple commands to turn around and cuff up. The inmate refused my commands. He then appeared to raise his hands in my direction, and another officer on site brought inmate Bates to the ground. That officer, inmate Bates, and I fell to the ground, and other officers, who had responded to the earlier body alarm, were present and also attempted to subdue the inmate. Once the inmate was subdued, he was escorted to Health Services by a Lieutenant. I had no further interaction with the inmate, and to the best of my recollection, I was not involved in packing or shipping the inmate's property.

ECF No. 37-2 at 4.

Defendant Robert Smith also provided memorandum to Lt. Doyle on the day of the

December 10, 2015 incident, stating

On December 10, 2015 at approximately 7:51am[,] I, Officer Smith, was assigned as the L-2 Housing Unit Officer. While observing the inmate compound inmate movement a body alarm was activated by the L-4 officer. Upon my arrival the L-4 officer was attempting to escort inmate Bates Reg# 10452-007 out of the unit's compound side door. Inmate Bates was being disruptive and was refusing direct commands to turn and face the wall. After failing to get inmate Bates to comply he then turned around with his hands coming upwards towards the L-4 officer in an abrupt and fierce manner. I then stepped in and used the minimum amount of force necessary to try and stop Bates' progress towards the officer. Inmate Bates and I were then on the ground as I tried to get him to comply with the order to put on restraints. Inmate Bates was swinging his arms and kicking his legs in a wildly aggressive manner and resisting and refusing direct orders to submit to restraints. At that time more staff arrived on scene to assist and I continued holding inmate Bates' right hand and arm so staff could apply hand restraints in a safe manner. Restraints were finally applied to inmate bates [sic] and he was escorted by staff away from the unit.

ECF No. 37-3 at 4. Defendant Robert Smith also provided a May 2, 2017 sworn declaration,

stating in pertinent part that

On December 10, 2015, I was assigned as the L-2 housing unit officer. Another housing officer in the adjacent unit activated his body alarm at approximately 7:51 am. When I arrived on scene the other officer was escorting inmate Bates out of the unit compound's side door. I witnessed inmate Bates refuse multiple direct commands to turn and face the wall. I then saw him begin to lift his hands towards the officer, and at that point I intervened and brought him to the ground. On the way to the ground, inmate Bates landed on top of me. Other officers, who

had responded to the earlier body alarm, were present and also attempted to subdue the inmate.  Once the inmate was subdued, he was escorted to Health Services by a Lieutenant. I had no further interaction with the inmate . . . I deny that I used excessive force against the plaintiff.

ECF No. 37-3 at 2 – 3. Defendants also produce the sworn declaration of Defendant Lieutenant

John Squires, who states in pertinent part that

1. I, John Squires, have worked for the Bureau of Prisons since October 2003, and have been a Lieutenant since June 2011. I am assigned to the Federal Correctional Complex, Hazelton, West Virginia ("FCC Hazelton").

2. I am aware that the Plaintiff. inmate Donald  Bates, Federal  Register Number 10452-007, has filed a lawsuit alleging that prison staff assaulted him December 10, 2015, and intentionally  destroyed  his personal  property.   He makes no specific allegations against me [sic].   I was not involved in the use of force incident, and was not in the unit when this incident occurred.

3.  I deny I assaulted or used excessive force against the Plaintiff.

ECF No. 37-5 at 1. Finally, the Defendants produce the sworn declaration of Defendant

Lieutenant Matthew Doyle, who states in pertinent part that

1. I, Matthew Doyle, have worked for the Bureau of Prisons since October 2000, and have been a Lieutenant since February 2010. I am assigned to the Federal Correctional Complex, Hazelton, West Virginia.

2. I am aware that the Plaintiff, inmate Donald Bates, Federal Register Number 10452-007, has filed a lawsuit alleging that prison staff assaulted him December 10, 2015, and intentionally destroyed his personal property. He makes no specific allegations against me [sic].

3. On December 10 2015, a housing unit officer activated his body alarm, indicating an emergency situation. I responded to the area, and when I arrived on scene, the Plaintiff was already being subdued by other officers, and I had no physical contact with him. Once he was handcuffed, I did escort him across the yard to Health Services, where he could be evaluated for any injuries.

4. I deny I assaulted or used excessive force against the Plaintiff.

ECF No. 37-6 at 2.

A careful review of the record, specifically, the declarations of Mulac and Smith, clarifies the limited views provided by the Vicon surveillance footage. It is apparent from the surveillance video that it was Bates' own initial refusal to comply with Mulac's simple directive to turn around to submit to a pat-down that morning that began the whole incident, not an out-of-control Mulac who, without provocation, threw the Plaintiff to the ground and ran at/jumped on him before dragging him off the unit by his neck. ECF No. 1 at 5 – 6 and 11.  To the contrary, the video shows that once Plaintiff did finally begin following direction, Mulac calmly walked him off the dayroom/housing unit while guiding him by holding his right shoulder/upper arm. Once Bates was escorted from the dayroom/housing unit onto the outside porch, and Mulac apparently gave him multiple commands to turn around and cuff up, Bates then stopped cooperating again. Although the limited view provided by the LR Inner and/or L4 Outer footage does not clearly show Bates raising his hands, it is apparent that the two COs were able to see what the viewer cannot clearly see from the footage, such that they recognized the need to immediately subdue Bates by bringing him to the floor and calling for assistance. There is no evidence from the Vicon surveillance footage that Mulac, Smith, or any other CO ever "kicked, punched or jumped on" Plaintiff, either before or after he was escorted from the housing unit, as Plaintiff contends. While the COs were required to subdue Bates by holding him down with their arms, legs and bodies, there is no evidence from the footage that Plaintiff was unnecessarily "jumped on," let alone kicked or punched. As for Plaintiff's contention that despite the fact that he was handcuffed, badly injured and never resisted, that the Defendants took him into the stairwell to continue kicking and beating him about the head anyway, neither the Vicon surveillance footage nor the report of Plaintiff's relatively minor injuries in his medical records support such a claim.

In sum, the undersigned finds that the video surveillance evidence does not support the Plaintiff's version of the events; to the contrary, it contradicts Plaintiff's version of the events from start to finish. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. See Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686, 694 (2007). Beyond unsupported conclusory allegations to the contrary in a sworn declaration attached to his response to the Defendants' dispositive motion, Plaintiff has failed to present any evidence to dispute the surveillance video evidence and Defendants' assertions that the force applied on December 10, 2015 was applied in a good-faith effort to maintain or restore discipline, and not maliciously and sadistically to cause harm. Plaintiff's conclusory allegations do not meet the "heightened pleading standard" required in actions against government officials. See Randall v. United States, 95 F.3d 339 (4th Cir. 1996); see also Dunbar Corp. v. Lindsey, 905 F.2d at 764.

Accordingly, the undersigned finds that Plaintiff has failed to state a claim upon which relief can be granted.  Because there is no genuine issue of material fact to preclude summary judgment for Defendants on these claims, they should be dismissed.

## B. Deliberate Indifference to Serious Medical Needs

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind."  Wilson v. Seiter, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).[7] The Fourth Circuit has gone one step further under the objective component analysis, by requiring not only that the condition be serious, but also that a prisoner provide evidence that his condition was not timely or properly treated. Harden v. Green, 2001 WL 1464468, *3 (4th Cir. Nov. 19, 2001).

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. Wilson, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn,

---

[7] The following are examples of what does or does not constitute a serious injury. A rotator cuff injury is not a serious medical condition. Webb v. Prison Health Services, 1997 WL 298403 (D. Kansas 1997). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). And, arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997); Davis v. Merengo County Jail, 2008 U.S. Dist. LEXIS 124427, * 22 - 23 (S.D. Ala. July 18, 2008) (Cassady, W.E., Mag. J.), adopted by Davis v. Marengo County Jail, 2008 WL 3852664 (S.D. Ala. Aug. 18, 2008) (unreported decision) (§ 1983 civil rights case, alleging excessive force and denial of medical care after pepper spray exposure and an approximately five minute delay in inmate's removal for fresh air; held: pepper spray exposure only constituted de minimis force and did not rise to the level of a Fourteenth or Fifth Amendment violation).

896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical

staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual

punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir.

1985). A constitutional violation is established when "government officials show deliberate

indifference to those medical needs which have been diagnosed as mandating treatment, conditions

which obviously require medical attention, conditions which significantly affect an individual's daily

life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales

Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d

158, 162 (2nd Cir. 2003)).

Here, Plaintiff contends that after the December 10, 2015 incident of excessive force,

despite the fact that he had suffered a "dislocated or broken middle finger, [an] injury to [his]

lower back, [a] swollen right eye, bruises to both elbows, knee, wrist, and . . . face [ECF No. 1 at

18]," he was not fed the whole day and received no treatment for his injuries. Id. at 10. He

contends that instead, he was left in a holding cell for "numerous hours." Id. at 12.

Defendants' account directly contradicts this. In support, they attach the sworn

declaration of Stephanie Long, Regional Health Systems Specialist at the BOP's Mid-Atlantic

Regional Office, which states in pertinent part that

> 3. I have reviewed the Plaintiff s medical records from December 10, 2015,
> through January 30, 2017. On December 10, 2015, he was seen in Health
> Services at the Federal Correctional Institution Hazelton, West Virginia for an
> injury assessment. Initial examination was limited because he was uncooperative
> during the exam. It was noted that he had superficial abrasions below the right
> eye with mild swelling. He also was noted to have abrasions on the left elbow,
> right hand, right wrist, left knee and left hand, 3rd digit. Plaintiff did not have any
> signs of trauma, and was in no apparent respiratory or cardiac distress . . .
>
> 4. The Plaintiff was again seen by Health Services staff when he arrived at FCI
> Cumberland later that same day. Upon examination a small contusion was noted
> just below his right eye. There were no open areas or bleeding, only mild

swelling and bruising.  Superficial abrasions were noted to posterior left ear, left hand dorsal fingers, and right index finger over PIP joint, dorsal right hand, right medial wrist, left wrist, left elbow, left knee.  All wounds with dried blood, no edema, and no infection noted. He did complain of pain to his lower back, and was ordered Motrin for pain . . .

5. On December 11, 2015, the Plaintiff had a follow up encounter performed in the Special Housing Unit health room.  He complained of pain all over, back pain, and hand pain, indicating his right hand was worse. On exam it was noted that he had multiple abrasions/lacerations, and had limited range of motion in his right wrist and index finger . . .

6. On December 11, 2015, x-rays were taken of his right hand because of swelling.  The x- rays were negative for any injury . . .

7. On December 11, 2015, x-rays were also taken of his lumber spine due to self-reported back pain. The x-rays were negative except for mild degenerative disc disease in the lower lumbar spine . . .

ECF No. 374 at 1 – 3.

Defendants contend that as soon as Plaintiff was cuffed and subdued, he was taken to Health Services by a Lieutenant.  ECF No. 37 at 4.  He was medically assessed twice that day; the first time was immediately after the incident, but the exam was limited because he was so angry and uncooperative.  Id. He was noted to have a superficial abrasion below the right eye with swelling, abrasions on the left elbow, right hand, right wrist, left knee and left hand, third digit. Id. He had no other signs of trauma and was in no apparent respiratory or cardiac distress. Id.  Defendants attach a copy of Plaintiff's medical record for this visit, showing that the incident occurred at 7:52 a.m. and he was seen in Health Services at 8:50 a.m. See ECF No. 37-4 at 6 – 7. Plaintiff was assessed again at 4:54 p.m. that day when he arrived at FCI Cumberland, where he was sent as a holdover for institution-to-institution transfer. ECF No. 37 at 4. A small contusion was noted just below his right eye, but there were no open areas or bleeding, only mild swelling and bruising. Id. at 4 – 5.  He had superficial abrasions to the posterior left ear, left hand dorsal fingers, and right index finger over the PIP joint, dorsal right hand, right medial wrist, left wrist,

left elbow, and left knee.  Id. at 5.  All abrasions had only dried blood; there was no swelling or signs of infection in any of them. Id. He did report lower back pain at this time and was ordered Motrin for pain. Id.  Defendants attach a copy of Plaintiff's medical record for this visit. See ECF No. 37-4 at 9 – 11. Plaintiff was medically examined again at 11:21 a.m. the next day. See ECF No. 37 at 5. Defendants attach a copy of the medical record for this visit as well; Plaintiff was noted to have multiple abrasions and some tiny skin tears, ranging from 0.5 centimeter to 3 centimeters,[8] on the left knee, right elbow, on multiple fingers, and on the left hand. See ECF No. 37-4 at 14.  He also had a 0.5 cm cut to the left ear. Id. All of these were cleaned with normal saline and covered with gauze and occlusive dressings. Id. Because he complained of low back pain, swelling of the right wrist and right index finger with limited range of motion, x-rays were taken. ECF No. 37 at 5; see also ECF No. 37-4 at 15.  The x-rays of his right hand were negative for fracture or dislocation. ECF No. 37 at 5; see also ECF No. 37-4 at 19. The x-ray of his back was negative except for mild degenerative disc disease to the lower lumbar spine. ECF No. 37 at 5; see also ECF No. 37-4 at 21.   Bates was seen again that same day for a follow up visit at 12:54 p.m. for complaints of back pain, during which he advised medical personnel that his right wrist wasn't "that bad" and that he could move it without any difficulties, that it was his lower back that was the problem. ECF No. 37-4 at 16. He underwent a musculoskeletal exam and was diagnosed with "low back pain, lumbago," advised to use moist heat, Ibuprofen and Tylenol as needed, to follow up at sick call as needed and return immediately if his condition worsened. Id. at 17. He was counseled on his plan of care and verbalized understanding. Id.

In his response in opposition, Plaintiff argues that the medical records of his injuries "are not consistent with the statements of the prison guards" and that he had "several injuries

---

[8] These measurements are equivalent to a range of 0.1968503937 inches to 1.1811023622 inches.  See Convert CM to Inches, *available at* < https://www.unitconverters.net/length/cm-to-inches.htm >

stemming from this incident." ECF No. 53 at 3.  He contends that "[m]erely restraining someone would not result in these types of injuries." Id.

   As an initial point, it is clear from the record that Plaintiff has not named any BOP medical personnel as defendants, nor has he specifically alleged that any of the named defendants denied him medical care, thus any claim of deliberate indifference against any named defendant fails to state a claim upon which relief can be granted.  Moreover, it is also apparent from the record before the undersigned that Bates was seen and examined at FCI Hazelton by James Nolte, a Registered Nurse Practitioner ("Nolte"), within the hour after the December 10, 2015 incident [see ECF No. 37-4 at 6 – 7], refuting Bates' claim that he was left alone for "numerous hours" in a holding cell without food or medical care after the incident. ECF No. 1 at 12.  Nolte noted that Plaintiff was irritable, agitated, angry, hostile, and uncooperative, but not in any acute physical distress, and his injuries, such as they could be evaluated, were found to be minimal. ECF No. 37-4 at 6 – 7. Bates was transferred from FCI Hazelton later that day, thus, even if he had been denied medical care after that visit, none of the named Defendants in *this* action could be faulted.  However, there is no support in the record that *any* BOP employee at *any* facility was deliberately indifferent to Plaintiff's medical needs.

   Plaintiff was examined again later that day at FCI Cumberland, and although calmer and more cooperative, his injuries were still noted to be minimal; pain medication was prescribed.  See ECF No. 37-4 at 9 – 11.  He was examined again the following morning, approximately 17 ½ hours later; his abrasions were cleaned and dressed; pain medication was continued, and x-rays were ordered. ECF No. 37-4 at 13 – 15.

   It appears, then, that Plaintiff's only injuries from the December 5, 2015 incident were a small bruise below the right eye, tiny half-centimeter to three-centimeter abrasions or skin tears in various places, and one half-centimeter laceration to the left ear. Further, within the first 28 hours after the incident, Plaintiff was seen by BOP medical personnel four times; was examined,

treated, prescribed medications, and had his minimal abrasions and skin lacerations cleaned and dressed; he received x-rays and was counseled on his plan of care.  Given the record before the undersigned, it is clear Plaintiff's medical needs for these minor injuries were never ignored and that he was not denied medical care. It appears, then, that Plaintiff was dissatisfied with the care that he received. However, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983[9] claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Treatment may be limited "to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977).

Accordingly, after a thorough review of the record, the undersigned finds that because Bates has failed to establish that any of the named defendants acted with deliberate indifference to his medical needs, he has failed to state a claim upon which relief can be granted. Accordingly, there is no genuine issue of material fact with respect to Plaintiff's deliberate indifference claims.

**C. Destruction of Personal Property**

Plaintiff contends that when he was transferred from FCI Hazelton, that all of his legal, personal and valuable property was destroyed by Defendant R. Mulac "or who ever [sic] packed my property." ECF No. 12.  He asserts that he never received the BP-383 property form that would show all of the things he had in his possession. Id.  He seeks $2,000,000.00 in compensatory damages for the same. Id. at 16 & 18.

---

[9] Case law under 42 U.S.C. § 1983 is applicable to Bivens actions.  See Butz v. Economou, 438 U.S. 478, 504 (1978).

Defendants contend that on May 12, 2016, less than one month after he arrived at USP McCreary, Plaintiff received all of his personal property that was mailed from FCI Hazelton; they contend that he signed the BP-383 form, indicating that he had received his things and did not note any items were missing. ECF No. 37-1 at 3.  They attach a copy of Plaintiff's signed BP-383 form in support.  See Inmate Personal Property Record, ECF No. 37-1 at 11 – 12. Plaintiff's response in opposition makes no further mention of this claim.  See ECF No. 53.

Nowhere in his pleadings does Plaintiff identify what items from his personal property were allegedly intentionally destroyed or missing when his property followed him from FCI Hazelton. Other than his self-serving, unsupported, and conclusory allegations, the Plaintiff provides no support for this claim at all.  Moreover, it is undisputed that the inventory report from the day Plaintiff signed and received his property from FCI Hazelton shows that it was "R. Cl___ [illegible]" who was actually the person responsible for inventorying the Plaintiff's property.  See ECF 37-1 at 11 - 12.  However, "R. Cl___" is not a named party to this action. Accordingly, as to the Plaintiff's claim of lost property, he has failed to state a claim upon which relief can be granted. Thus, there is no genuine issue of material fact as to this claim, and summary judgment should be granted to the Defendants.

## D. Disciplinary Action Decisions Resulting in Loss of Good Conduct Time are Not Cognizable in a Bivens action

In his complaint, Plaintiff contends that as a result of the "unprovoked" December 10, 2015 incident, he was wrongfully charged with a "false incident report" [ECF No. 1 at 18] for "224 assault" and "stripped for 6 months of everything including visitation, commissary, and 40 days good time[.]" Id. at 10 & 12. He also avers that his "points" were "jacked up . . . beyond the norm," causing him to be sent to a USP from a lower security institution. Id. at 12.  He requests

31

that the "224 incident report" be dismissed, his 40 days of good conduct time be restored, and he be restored back to an FCI from a USP. Id. at 18.

The Defendants assert that claims seeking to expunge a disciplinary action and restore good conduct time are not cognizable in a Bivens action.  ECF No. 37 at 13. Plaintiff's response in opposition makes no further mention of this claim.  See ECF No. 53.

Challenges to the conditions of a prisoner's confinement are appropriately raised pursuant to a civil rights complaint.  See Preiser v. Rodriguez, 411 U.S. 475, 499-500 (1973)(a civil rights action is a proper remedy for a prisoner challenging the conditions of his prison life). However, a habeas corpus petition under 28 U.S.C. § 2241 is used to attack the manner in which a sentence is executed.  See 28 U.S.C. § 2241.  It is well settled that challenges to the fact or length of confinement are properly considered in the context of habeas corpus. Id. at 487 – 88 (holding that a challenge to the length of "actual confinement in prison" must be brought as a habeas corpus action).  Moreover, as for Plaintiff's claim that misconduct charge was false, that claim must fail as well. It is obvious from the Vicon surveillance footage that Plaintiff was the aggressor; that he did resist directives to submit to a pat-down; and that he repeatedly struck at Mulac and fought with Mulac and the other COs who tried to restrain him; therefore, the charge was not false. Nonetheless, even if the misconduct charge were false, Plaintiff does not have a constitutional right to be free from false disciplinary reports. "The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights." Lewis v. Viton, No. 07-3663, 2007 WL 2362587, at *9 (D.N.J. Aug. 14, 2007) (citing Freeman v. Rideout, 808 F.2d 949, 962-53 (2nd Cir. 1986)). There simply is no constitutional right to be free from being falsely accused. See McClay v. Fowlkes, No. 1:07cv1080, 2008 WL 3992637, *4 n.6 (E.D. Va. Aug. 27, 2008) ("To the extent the plaintiff claims that he was falsely accused, he fails to state a § 1983 claim

because '[t]he prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.") (internal citations omitted); Anderson v. Green, No. 082708, 2009 WL 2711885 *4 (D. Md. Aug. 24, 2009); Riggerman v. Ziegler, No. 5:11-0868, 2012 WL 4119674, *5 (S.D. W.Va. Aug. 22, 2012) (inmates have no constitutional right prohibiting false charges against them).

Because the Plaintiff has failed to state a claim upon which relief can be granted, there is no genuine issue of material fact as to this claim, and thus, summary judgment should be granted to the Defendants.

**E. Unknown Parties/John Doe Defendants**

As Plaintiff has been previously advised, a plaintiff may name "John Doe" as a defendant when the identity of a defendant is unknown. Boyd v. Gullet, 64 F.R.D. 169 (D. Md. 1974). However, a district court is not required "to wait indefinitely" for the plaintiff to provide the defendant's true identity to the Court. Glaros v. Perse, 628 F.2d 679, 685 (1st Cir. 1980).

Plaintiff initiated this action on October 25, 2016. On December 13, 2016, summonses were issued for the named defendants and Plaintiff was directed to provide identifying information for the "unknown parties" defendants within thirty days or risk their dismissal from this case. Plaintiff did not provide the information then and has made no attempt to provide it since. Accordingly, service could not be effectuated on the "unknown parties" John Doe defendants.

It has been one year and over two months since Plaintiff filed his complaint. Federal Rule of Civil Procedure 4(c) indicates that "[a] summons must be served together with a copy of the complaint." The time frame within which service must be effected is articulated in Rule 4(m), which provides that if service of the summons and complaint is not made upon a defendant

within 90 days after the filing of the complaint, "the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant[.]"  But if the plaintiff shows good cause for the failure, "the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m); see also Bush v. City of Zeeland, 74 Fed. Appx. 581, 2003 WL 22097837 at *2 (6th Cir. 2003)(citations omitted).

Here, Plaintiff has had more than sufficient time to provide correct information in order to effectuate service on these defendants. Noting Plaintiff's lack of diligence in doing so, the undersigned recommends that the Plaintiff's claims against the "unknown parties" John Doe defendants be dismissed for failure to timely effectuate service.

## IV. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [ECF No. 36] be **GRANTED** and that Plaintiff's complaint [ECF No. 1] be **DENIED and dismissed with prejudice  under § 1915(e)(2)(B)(i) for the failure to state a claim.**[10]

Further, it is recommended that Plaintiff's pending *pro se* Motion for Discovery [ECF No. 47] be **DENIED as moot.**

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District

---

[10] The Plaintiff is warned that that pursuant to 28 U.S.C. §1915(g) he will not be granted *in forma pauperis* status in the future, if he has "on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."  The instant case will be the first filed by Plaintiff in this district that has been recommended for dismissal as frivolous and/or for failure to state a claim upon which relief can be granted.

Judge. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of Court is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record.

This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the Magistrate Judge's association with this case.

DATED: January 9, 2018

/s/ *Michael J. Aloi*

MICHAEL J. ALOI
UNITED STATES MAGISTRATE JUDGE